**VALMONT INDUSTRIES, INC.,**
**Plaintiff/Cross–Appellant,**

v.

**REINKE MANUFACTURING COMPA-**
**NY, INC., Defendant–Appellant.**

**Nos. 91–1377, 91–1378.**

United States Court of Appeals,
Federal Circuit.

Jan. 7, 1993.

**1040**

Dennis L. Thomte, Zarley, McKee, Thomte, Voorhees & Sease, of Omaha, NE, argued for plaintiff/cross-appellant.

G. Brian Pingel, Shearer, Templer & Pingel, P.C., of West Des Moines, IA, argued for defendant-appellant.

Before MICHEL, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and RADER, Circuit Judge.

RADER, Circuit Judge.

The United States District Court for the District of Nebraska determined that Reinke Manufacturing Company infringed Valmont Industries' U.S. Patent No. Re. 31,838 ('838 patent). *Valmont Indus. v. Reinke Mfg. Co.*, 14 USPQ2d 1374, 1990 WL 67881 (D.Neb.1990). Because the district court incorrectly found infringement of claims containing means-plus-function limitations, this court reverses.

## BACKGROUND

On April 9, 1974, U.S. Patent No. 3,802,627 (the '627 patent) issued on an invention of David Seckler and David Porat, assignors to Valmont's predecessor-in-interest. The '627 patent was reissued as the '838 patent in 1980. The '838 patent claims a self-propelled irrigation apparatus for watering non-circular areas. Specifically, the '838 patent describes an apparatus to water the corners of a field which a center pivot irrigator misses. A center pivot irrigation system includes a main arm assembly mounted at one end to a central pivot and supported at intervals by self-propelled support towers. The main arm rotates around a center water supply and irrigates a circular area of land. A standard center pivot irrigation system, however, does not supply water to the corners of a square plot of land.

The '838 patent features an apparatus which attaches to the main arm of a center pivot irrigator and waters the corners of a field. Claim one states:

1. Irrigating apparatus for supplying water to a non-circular area, comprising a rotatable main arm assembly *mounted at one end to a fixed base pivot and rotatable thereabout* for supplying water to a first portion of said area, an extension arm assembly at the *other* end of said main arm assembly for supplying water to portions of said area outside of said first portion, *said extension arm assembly and main arm assembly each being supported on one of more support towers, with each assembly supporting a plurality of spaced irrigating sprinklers, said main arm assembly support towers having wheels and wheel driving means,* means for moving said extension arm assembly with respect to said main arm assembly, and control means for operating said moving means to move said extension arm assembly relative to said main arm assembly to irrigate said portions outside of said first portion as said main arm rotates.

(Underlined matter indicates additions made during reissue.)

The patent claims an irrigating apparatus with an extension arm assembly. This extension arm, which connects to the free end of the main arm assembly, swings out to irrigate portions of the field outside the main arm's circular coverage. Like the

centrally pivoted main arm, self-propelled towers support the extension arm.

Following electronic signals, the '838 patent's extension arm assembly moves out into the corners of a field. To reduce crop damage, the extension arm support towers follow the same path into the corner with each revolution. The specification notes that angle encoders at the center pivot and the end of the main arm control the extension arm to ensure these uniform revolutions. The center pivot angle encoder measures the angle between the main arm and a predefined axis in the field. The second angle encoder measures the angle between the extension and the main arms. These angle encoders send a digital signal to a comparator circuit which monitors the angular relation of the two arms.

The comparator sends an electronic signal to a steering motor on a wheel of the extension arm. The electronic signal pivots the wheel to keep the extension arm in place relative to the main arm. Drive motors attached to the wheel propel the extension arm. In this manner, the '838 patent's extension arm follows a precise path dictated by these angular relationships.

In March 1974, two Valmont employees, Mr. Robert Daugherty and Mr. William Eaton, also sought a patent on enhanced center pivot technology. Their application also described an extension arm to irrigate areas outside the main arm's reach. The extension arm in the Daugherty and Eaton invention, however, followed a buried electrical conductor, not electrical signals generated by angle comparators. In September 1975, U.S. Patent No. 3,902,668 issued on the Daugherty and Eaton invention to Valmont.

In 1980, Valmont filed reissue applications for both the '627 and '668 patents. The Patent and Trademark Office (PTO) approved the Seckler and Porat application as Patent No. Re. 31,838, but refused to reissue the Daugherty and Eaton patent ('668). During reissue proceedings on the Daugherty and Eaton patent, Valmont contended that the buried cable steering system was "completely different" from the angle comparator steering system in the '627 patent.

In 1985, Valmont sued Reinke for infringement of the '838 patent. Reinke manufactured and sold corner irrigation systems. Reinke's extension arm follows a buried cable. The district court found that Reinke had infringed the '838 patent. Reinke appealed.

## DISCUSSION

The district court found that Reinke had infringed claims 1, 2, 3, 8, 14, 18, and 22 of the '838 patent. Each of these claims uses "means-plus-function" language. The primary infringement issue in this case involves the "control means" element of claim 1:

> [C]ontrol means for operating said moving means to move said extension arm assembly relative to said main arm assembly....

In relation to this control means limitation, the trial court stated:

> The Court concludes that the means for steering in the two systems are equivalent—that is they are substantially the same function—there's a control means for operating the moving means; they perform the function in substantially the same way—by imparting an electric signal to the steering motors to cause the steering wheels to pivot; and they achieve substantially the same result—the movement of the extension arm in an angle relative to the main arm in order to reach and irrigate the corners of a field....

*Valmont*, 14 USPQ2d at 1381. Apparently the district court applied some form of equivalency analysis to find infringement. In the context of a means-plus-function claim, the district court might have applied either the equivalency analysis of 35 U.S.C. § 112 (1988) or the doctrine of equivalents.

### Section 112

The Patent Act provides explicit guidance for interpretation of claim elements expressed in means-plus-function terms:

> An element in a claim for a combination may be expressed as a means or step

for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.

Congress added this language to the Patent Act of 1952 to change the doctrine enunciated in *Halliburton Oil Well Cementing Co. v. Walker,* 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3 (1946). *See,* P.J. Federico, *Commentary on the New Patent Act,* Preface to 35 U.S.C.A. 25 (1954) (Commentary). In *Halliburton,* the Supreme Court prohibited use of means-plus-function language to describe the "most crucial element" of a combination claim:

The language of the claim thus describes this most crucial element in the "new" combination in terms of what it will do rather than in terms of its own physical characteristics or its arrangement in the new combination apparatus. We have held that a claim with such a description of a product is invalid as a violation of [the patent statute].

*Halliburton,* 329 U.S. at 9, 67 S.Ct. at 10. In particular, the Supreme Court feared that means-plus-function language was overbroad and ambiguous. *Id.* at 12, 67 S.Ct. at 12 ("Under these circumstances the broadness, ambiguity, and overhanging threat of the functional claim of Walker become apparent.").

Congress decided to permit broad means-plus-function language, but provided a standard to make the broad claim language more definite. The 1952 Patent Act included a new section 112. This new language permits a patent applicant to express an element in a combination claim as a means for performing a function. The applicant need not recite structure, material, or acts in the claim's means-plus-function limitation. With this new section, the 1952 Act rendered *Halliburton* obsolete. *Commentary* at 25.

The second clause of the new paragraph, however, places a limiting condition on an applicant's use of means-plus-function language. 35 U.S.C. § 112, ¶ 6. A claim limitation described as a means for performing a function, if read literally, could encompass any conceivable means for performing the function. *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1580, 12 USPQ2d 1382, 1386 (Fed.Cir.1989). This second clause confines the breadth of protection otherwise permitted by the first clause. *Id.* The applicant must describe in the patent specification some structure which performs the specified function. Moreover, a court must construe the functional claim language "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112. Section 112 thus permits means-plus-function language in a combination claim, but with a "string attached." The "attached string" limits the applicant to the structure, material, or acts in the specification and their equivalents. Indeed the section operates more like the reverse doctrine of equivalents than the doctrine of equivalents because it restricts the coverage of literal claim language. *Johnston,* 885 F.2d at 1580.

■ This court has explained:

In applying the "means plus function" paragraph of § 112, however, the sole question is whether the single means in the accused device which performs the function stated in the claim is the same as or an equivalent of the corresponding structure described in the patentee's specification as performing that function.

*D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1575, 225 USPQ 236, 239 (Fed.Cir.1985). In sum, for a means-plus-function limitation to read on an accused device, the accused device must employ means identical to or the equivalent of the structures, material, or acts described in the patent specification. The accused device must also perform the identical function as specified in the claims.

### The Doctrine of Equivalents

Equivalency under section 112, however, differs from the doctrine of equivalents. This court has stated:

[T]he word "equivalent" in § 112 should not be confused, as it apparently was here, with the "doctrine of equivalents."

*D.M.I.*, 755 F.2d at 1575.

■ The doctrine of equivalents has a different purpose and application than section 112. The doctrine of equivalents prevents a copyist from evading patent claims with insubstantial changes. *Charles Greiner & Co. v. Mari–Med Mfg.*, 962 F.2d 1031, 1036, 22 USPQ2d 1526, 1529 (Fed.Cir. 1992). In applying the doctrine, the Supreme Court refused to allow an "unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). This statement elucidates both the purpose of the doctrine and the type of conduct which triggers its application. An equivalent under the doctrine of equivalents results from an insubstantial change which, from the perspective of one of ordinary skill in the art, adds nothing of significance to the claimed invention.[1] An equivalent under the doctrine of equivalents, though not literally meeting the claims, still infringes the patent.

■ The doctrine of equivalents involves a familiar three-part inquiry. An accused device[2] which "performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention," *Pennwalt*, 833 F.2d at 934, is an equivalent.[3]

Section 112 and the doctrine of equivalents have something in common. The word "equivalent" in section 112 invokes the familiar concept of an insubstantial change which adds nothing of significance. In the context of section 112, however, an equivalent results from an insubstantial change which adds nothing of significance to the structure, material, or acts disclosed in the patent specification. A determination of section 112 equivalence does not involve the equitable tripartite test of the doctrine of equivalents. As this court has stated, "the sole question" under section 112 involves comparison of the structure in the accused device which performs the claimed function to the structure in the specification. *D.M.I.*, 755 F.2d at 1575; *Durango Assocs. Inc., v. Reflange, Inc.*, 843 F.2d 1349, 1357, 6 USPQ2d 1290, 1295 (Fed.Cir.1988).

■ In sum, section 112, ¶ 6, and the doctrine of equivalents have separate origins and purposes. Section 112, ¶ 6, limits the broad language of means-plus-function

1. This court has confirmed that the doctrine "does not mean one can ignore claim limitations." *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935, 4 USPQ2d 1737, 1739 (Fed.Cir.1987) (en banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426, *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988). Rather the doctrine "is designed to do equity ... it is not designed ... to permit a claim expansion that would encompass more than an insubstantial change." *Id.* (quoting *Perkin–Elmer Corp. v. Westinghouse Elec.*, 822 F.2d 1528, 3 USPQ2d 1321 (Fed.Cir.1987)).

2. In *Pennwalt*, this court focused on the presence of each claim limitation or its equivalent in the accused device. This court has confirmed that the doctrine "does not mean one can ignore claim limitations." *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935, 4 USPQ2d 1737, 1739 (Fed.Cir.1987) (en banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426, *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988). If an accused device lacks any limitation or an equivalent, it does not infringe the claim. Under the doctrine of equivalents, the accused device and the claimed invention cannot work in "substantially the same way" if a limitation (including its equivalent) is missing. *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 867 F.2d 1572, 1577, 9 USPQ2d 1995, 1999 (Fed.Cir.1989).

3. This tripartite inquiry derives from *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). In *Graver Tank*, the Supreme Court expressed the last element of this test once as "to obtain the same result" and once as "[to] accomplish substantially the same result." *Id.* at 608, 70 S.Ct. at 856. This court clarified any potential confusion over whether a change must obtain exactly the same or substantially the same result when it expressed the test in the latter form. *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 901–02, 221 USPQ 669, 679–80 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

**1044**

limitations in combination claims to equivalents of the structures, materials, or acts in the specification. The doctrine of equivalents equitably expands exclusive patent rights.

■ To the extent that the district court in this case applied section 112, it erred. The trial court did not fulfill the statutory mandate to examine the specification to identify the disclosed means and to determine whether Reinke used equivalents thereof. This error caused a misapplication of section 112 and an erroneous finding of infringement.

Upon confronting means-plus-function terms in the "control means" limitation, the trial court should have identified the structure in the specification. The '838 specification refers to control means in column 3:

There are a number of ways in which movement of the extension arm 16 may be controlled. In the preferred embodiments, as explained below, the position of the steering wheels is controlled electrically as a function of the position angle α of the main arm 12.

. . . .

[A] position angle encoder 30 is located at the base 10 for the main [extension] arm 12. The encoder 30 may be an analog-to-digital device which converts the angle α to a five-bit digital signal. A similar position angle encoder 31 is physically located at the support tower 22Y for the steering wheels 24Y. . . .

'838 Patent, col. 3, lines 3–7, 37–43. This language describes angle encoders and comparator circuits which adjust and maintain the angular relationship between the main arm and the extension arm. The comparator circuit sends an electrical signal to a steering motor to keep the extension arm on course. The '838 patent describes a control means which steers the extension arm by maintaining angular relationships between the irrigator arms.

With this structure setting the limits for the control means, the trial court should have compared this structure to Reinke's device to see if it uses these means or their structural equivalent to perform the claimed control means function. The rec-

ord shows that Reinke's extension arm support towers follow a buried electromagnetic cable. Sensors on Reinke's extension arm receive signals from this buried wire. The sensors, in turn, send a steering signal to keep the wheels on the path of the buried cable. In this manner, the Reinke arm follows the buried cable around the field.

Comparison of these two control means compels the conclusion that the claimed control means and Reinke's control means are not structurally equivalent under section 112. The trial court incorrectly determined that the "means for steering in the two systems are equivalent." The trial court's determination suggests that it compared the accused system to Valmont's irrigation system, rather than to the control means structure in the specification. Moreover, even though both ·the control means in the specification and the control means on Reinke's device use electric signals, the structures generating those signals are strikingly different. Reinke's structure senses electromagnetic signals from a buried cable. The invention described in the '838 patent senses the angular relations between the main arm and the extension arm and generates signals to adjust and maintain that relationship as the main arm rotates.

To the extent that the district court applied the doctrine of equivalents to the claimed invention as a whole, it also erred. Although Reinke's buried cable performs substantially the same control function and achieves substantially the same result as the '838 control means, it does so in a very different way. Reinke's buried cable controls the extension arm in a very different way from the angle comparator controls disclosed in the patent. Therefore, Reinke's device does not meet the "way" prong of the tripartite test under the doctrine of equivalents.

Moreover, Valmont's statements during prosecution of its reissue applications directly contradict its contention that Reinke's control means is an equivalent either under section 112 or under the doctrine of equivalents. In a reissue proceed-

ing in which Valmont itself sought patent protection for a buried cable system, Valmont argued that buried cable steering is "completely different" from Seckler and Porat's '838 patent:

> The invention [buried cable steering] would not have been obvious over the prior art because the approaches are completely different. First Seckler and Porat ... followed the approach of measuring the angular position of the main arm.

Joint Appendix at 213. This court agrees that a buried cable steering system is completely different from the control means disclosed in the '838 patent.

The district court could not properly have found infringement under a section 112 analysis or by the doctrine of equivalents. By concluding that Reinke infringed claim 1 of the '838 patent, the district court clearly erred. Claim 2 depends from claim 1 and for the same reasons is not infringed. Claims 3, 8, 14, 18, and 22 contain "control means" or "steering means" language. The steering or control means language in these claims specifically refers to angular comparisons. For instance, claim 8 requires "steering means responsive to the angular position of the main arm assembly." Claim 14 requires "means to vary the angular position of the extension arm assembly." For the same reason the broad claim 1 is not infringed, these narrower claims are not infringed.

## CONCLUSION

The Reinke device does not contain a structural equivalent of the control means set forth in the '838 patent. Nor does Reinke's device infringe under the doctrine of equivalents. Without infringement, the trial court's award of damages and its injunction cannot stand. Likewise, without infringement, this court dismisses Valmont's cross-appeal for increased damages and attorney fees as moot. For the reasons stated above, the judgment of the district court is reversed.

## COSTS

Each party will bear its own costs on this appeal.

**REVERSED.**